# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

HARNEY SOIL and WATER
CONSERVATION DISTRICT
Post Office Box 848
530 Hwy 20 South
Hines, OR 97738-0848

*Plaintiff*,

v.

UNITED STATES DEPARTMENT
OF THE INTERIOR
1849 C Street, N.W.
Washington, D.C.  20240

SALLY JEWELL
Secretary, Department of the Interior
1849 C Street, N.W.
Washington, D.C.  20240

BUREAU OF LAND MANAGEMENT
1849 C Street, N.W.
Room 5665
Washington, D.C.  20240

NEIL KORNZE
Director, Bureau of Land Management
1849 C Street, N.W.
Room 5665
Washington, D. C.  20240

RON DUNTON
Acting State Director
Oregon Bureau of Land Management
1220 S.W. 3rd Avenue
Portland, OR  97204

*Defendants.*

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

*Introduction*

Plaintiff Harney Soil and Water Conservation District ("Harney SWCD") challenges the

Oregon Greater Sage-Grouse Approved Resource Management Plan Amendment ("Oregon

RMPA"), dated September 2015, and the Record of Decision and Approved Resource

Management Plan Amendments for the Great Basin Region, including the Greater Sage-Grouse

Sub-Regions of Idaho and Southwestern Montana, Nevada and Northeastern California, Oregon,

Utah ("ROD"), dated September 2015, which approved the challenged Oregon RMPA.  In

conjunction with the ROD and Oregon RMPA, a Final Environmental Impact Statement

("FEIS") dated June 2015 was prepared and issued pursuant to the National Environmental

Policy Act ("NEPA"), 43 U.S.C. § 4331, *et seq.,* which the Harney SWCD also challenges.

*Standing*

1.  Attached hereto as Exhibit A and incorporated by reference herein is the declaration of

Carol A. Dunten, Chair of the Board of Directors of the Harney Soil and Water Conservation

District, which sets forth facts showing injury, causation and redressability, which satisfies the

elements of Plaintiff's standing under *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-1 (1992)

(standing requires that a plaintiff have suffered an "injury in fact" that is "actual or imminent,"

and that the injury is capable of being redressed by a favorable decision of the court).  *See also*

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. TOC, Inc.,* 528 U.S. 167, 180-81 (2000).

2.  Additionally attached hereto as Exhibits B, C and D and incorporated herein by

reference are the declarations of individuals represented by Plaintiff who will suffer injury in fact

from the Oregon RMPA.

1

3.   In addition, Plaintiff satisfies the "standing" requirements, because Defendants granted the Harney SWCD "cooperating agency" status under the National Environmental Policy Management Act ("NEPA") with respect to the development of the Oregon RMPA and entered into a memorandum of understanding ("MOU") with the Harney SWCD for that purpose.  By reason of such "cooperating agency" status, Harney SWCD has "standing" to seek judicial review of Defendants' decision adopting and issuing the Oregon RMPA and of its ROD and FEIS.  *Cf. Agdaagux Tribe of King Cove v. Jewell,* 128 F. Supp.3d 1176, 1190 (D. Alaska 2015) (concluding that plaintiffs had standing to challenge Secretary's decision; stating that where State and City of King Cove had been designated as "cooperating agencies" for purposes of NEPA, such designation would have been greatly diminished in value if the cooperating agencies could not seek review of the Secretary's NEPA decision).

4.   In addition, with respect to "procedural injury," a plaintiff need show, for "standing" purposes, only that the procedural step was connected to the substantive result, not that the agency would have reached a different substantive result.  An adequate causal chain must contain two links:  one connecting the omitted analysis to some substantive government decision that may have been wrongly decided because of the lack of the proper analysis and one connecting that substantive decision to a plaintiff's particularized injury.  *See Sierra Club v. Federal Energy Regulatory Comm'n*, 827 F.3d 59, 65 (D.C. Cir. 2016).  The attached Exhibit A demonstrates the Plaintiff can meet that test.

*Jurisdiction and Venue*

5.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 2201 (declaratory judgment); 28 U.S.C. § 2201 (injunctive relief) and 5 U.S.C. § 702, *et seq.* (Administrative Procedure Act).  Harney SWCD has suffered a

legal wrong and is adversely affected or aggrieved by the challenged ROD, Oregon RMPA and

FEIS, which are final agency actions, and it is entitled to seek review pursuant to 5 U.S.C. §§

702 and 704.  The challenged ROD, Oregon RMPA and FEIS are reviewable in accordance with

the scope of review provided by 5 U.S.C. § 706.

6.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(A), providing that

when a defendant is an agency or officer of the United States government, venue is proper in the

judicial district where a defendant resides, here, within the District of Columbia where

Defendants perform their duties.

*Standard of Review*

7.  Under 5 U.S.C. § 706, the court must, upon judicial review of an agency's action,

decide all relevant questions of law and must, under (2)(A), hold unlawful and set aside agency

action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law, and, under (2)(D) and (C), must hold unlawful and set aside agency action that is made

without observance of procedures required by law or is in excess of statutory authority or

limitations. The word "or" in paragraph (A) means that agency action must be set aside if it is

*either* arbitrary, capricious, an abuse of discretion *or* not in accordance with law.  The "not in

accordance with law" is a separate and independent prong in paragraph (A) and gives rise to a

legal determination that the court must make.  *See Sheridan Corp. v. U.S.*, 94 Fed. Cl. 663, 668

(2010).

*Parties*

8.  Harney SWCD is a soil and water conservation district organized and created pursuant

to Oregon's enabling statutes and established to effectuate Oregon's legislative policies set forth

in O.R.S. § 568.225 to conserve, protect and develop the state's natural resources, including,

among other conservation efforts, the prevention of soil erosion, control of floods, developing

water resources, preserving wildlife, engaging in collaborative efforts to protect watershed functions, protecting the tax base, protecting public lands and protecting and promoting the health, safety and general welfare of the people.

9.   Harney SWCD's local governing body has the powers set forth at O.R.S. § 568.550, including the power to survey, investigate, research and carry out preventive and control measures on lands within the district with the owner's consent; to investigate and survey needed improvements; to enter into agreements with and furnish aid to any governmental agency with respect to erosion control, water quality improvement, watershed enhancement, fish and wildlife activities and other natural resource management activities and other activities in furtherance of the district's responsibilities; to sue in the name of the district; to make contracts that are necessary or convenient to the district's exercise of its powers; and to enter into written agreements with and coordinate activities with federal, state and local governments relating to natural resource issues, including economic development, watershed management, invasive species, fuel reduction and wildfire planning and management.  Under Section 568.550 (4), a soil and water conservation district has the "standing" of an affected property owner to participate in public processes involving administrative rules, regulations, goals, guidelines, plans or other public body actions that may affect one or more properties within the district.

10.   Harney SWCD's local governing body has additional powers set forth at O.R.S. § 568.552, including the power to enter into agreements to furnish aid to any agency, governmental or otherwise, for conservation, development, utilization or disposal of water within the district.

11.   Harney SWCD is a local governmental agency or entity, and its suit is brought in that capacity.

4

12.  Defendants United States Department of Interior ("DOI"), its Secretary Sally Jewell, the Bureau of Land Management ("BLM") and its Director Neil Kornze issued, approved, adopted and are responsible for the ROD, Oregon RMPA and FEIS, which are at issue in this case.

13.  Defendant Sally Jewell is sued in her official capacity as Secretary of the DOI, whose office is located within the District of Columbia.  As Secretary, she is responsible for implementation of the NEPA, APA, the Federal Land Policy and Management Act ("FLPMA") and other federal statutes.

14.  Defendant Neil Kornze is sued in his official capacity as Director of the BLM, whose office is located within the District of Columbia. As Director, he is responsible for implementation of the NEPA, APA, the FLPMA and other federal statutes.

15.     Ron Dunton, Oregon State BLM Acting Director and is sued in his official capacity.  As Director, he is responsible for implementation of the NEPA, APA, the FLPMA and other federal statutes.

*Legal Background*

*A. National Environmental Policy Act*

16.  BLM and DOI prepared and issued a FEIS pursuant to NEPA dated June 2015 in connection with the challenged ROD and Oregon RMPA.

17.  NEPA, at 42 U.S.C. § 4332 (C), requires that major Federal actions significantly affecting the quality of the human environment must include a detailed statement about the environmental impact of the proposed action, the adverse environmental effects which cannot be avoided should the proposal be implemented, alternatives to the proposed action, the relationship between local short-term uses of man's environment and the maintenance and enhancement of

long-term productivity, and irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

18.  NEPA, at 42 U.S.C. § 4332 (C), requires that:  "Copies of such [detailed] statement and the comments and views of the appropriate … local agencies, which are authorized to develop and enforce environmental standards … shall be made available to the President, the Council on Environmental Quality and to the public … and shall accompany the proposal through the existing agency review processes."

19.  NEPA, at 42 U.S.C. § 4332 (E), requires that the Federal agency "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."

20.  NEPA, at 42 U.S.C. § 4332 (B), requires that the Federal agency identify and develop procedures, in consultation with the Council on Environmental Quality, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations.

21.  It is Congressional policy that the Federal government cooperate with local government in using all practicable means to promote the general welfare, fulfill social and economic requirements of present and future generations of Americans, attain the widest range of beneficial uses of the environment and achieve a balance between population and resource use which will permit high standards of living.  *See* 42 U.S.C. § 4331.

22.  The Council on Environmental Policy ("CEQ") has adopted regulations to implement NEPA, which bind all Federal agencies.  CEQ regulations provide, in part:

A.  "Cooperating agency" means any Federal agency which has jurisdiction or special expertise with respect to the environmental impact involved in a proposal or reasonable

alternative.  A local agency of similar qualifications may, by agreement, become a cooperating agency.  40 C.F.R. § 1508.5.

B.   Federal agencies shall cooperate with local agencies to the fullest extent possible to reduce duplication between NEPA and comparable local requirements.  40 C.F.R. § 1506.2.  *See also* 43 C.F.R. § 46.155 (Responsible Official must consult, coordinate and cooperate with local governments concerning environmental effects of any Federal action within the jurisdictions or related to the interests of these entities); 43 C.F.R. § 46.415 (describing required contents of an environmental impact statement, including "[t]he process used to coordinate with … local governments … who are interested or affected").

C.   "To better integrate environmental impact statements into State or local planning processes, statements shall discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned).  When an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law."  40 C.F.R. § 1506.2 (d).

D.   Any Federal agency preparing a final environmental impact statement shall consider comments and shall respond to them in specifically permitted ways and shall state its response in the final environmental impact statement.  All substantive comments received by the agency on the draft environmental statement should be attached to the final environmental impact statement.  40 C.F.R. § 1503.4.

E.   Federal agencies must adopt procedures to ensure that relevant environmental documents, comments and responses accompany the proposal through existing agency review processes.  40 C.F.R. § 1505.1.

F.   Federal agencies shall use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of their actions upon the quality of the human environment.  40 C.F.R. § 1500.2 (e).

G.   Federal agencies shall use all practical means to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment.  40 C.F.R. § 1500.2 (f).

H.   The alternatives should present the environmental impacts and the alternatives in comparative form to sharply define the issues and to provide a clear basis for choice among options.  Agencies must rigorously explore and objectively evaluate all reasonable alternatives and discuss the reasons for elimination of those alternatives that were eliminated.  Agencies must devote substantial treatment to each alternative considered in detail, including the proposed action, so that reviewers may evaluate their comparative merits.  Agencies must include the alternative of "no action."  Agencies must include appropriate mitigation measures not included in the proposed action or alternatives.  40 C.F.R. § 1502.14.

I.   Federal agencies must discuss the environmental impacts of the alternatives, including the proposed action, any adverse environmental effects which cannot be avoided if the proposal is implemented, the relationship between the short-term uses of man's environment and the maintenance and enhancement of long-term productivity and any irreversible or irretrievable commitments of resources if the proposal is implemented.  The discussion must include (1) discussion of direct and indirect effects and their significance; (2) conflicts between the proposed action and the objectives of local land use plans and policies for the area concerned; (3) environmental effects of alternatives, including the proposed action; (4) conservation potential of various alternatives and mitigation measures; (5) natural or depletable resource requirements; (6)

urban quality, historic and cultural resources; and (7) means to mitigate adverse environmental impacts.  40 C.F.R. § 1502.16.

J.  The Federal agency shall identify and discuss all factors, including economic, technical and national policy, which were balanced by the agency in making its decision and state how those considerations entered into its decision.  An agency must state whether all practicable means to avoid or minimize environmental harm has been adopted and if not, why not.  A monitoring and enforcement program shall be adopted for any mitigation.  40 C.F.R. § 1505.2.

K.  The "human environment" shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment.  When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.  40 C.F.R. § 1508.14.

### B.  Taylor Grazing Act

23.  The Secretary of the Interior shall make provision for the protection, administration, regulation and improvement of such grazing districts as may be created and shall make such rules and regulations, enter into cooperative agreements and do all things necessary to insure the objects of such grazing districts, namely, to regulate their occupancy and use, to preserve the land and its resources from destruction or unnecessary injury, [and] to provide for the orderly use, improvement and development of the range.  43 U.S.C. § 315a.

24.  The Secretary of the Interior is authorized to issue permits to graze livestock on such grazing districts to stock owners.  Preference shall be given in the issuance of grazing permits to those within or near a district, who are landowners engaged in the livestock business.  No

permittee complying with the rules of the Secretary shall be denied renewal of such permit if

denial would impair the value of the grazing unit of the permittee, when such unit is pledged as

security for any bona fide loan.  Permits shall be valid for a period of not more than ten years,

subject to the preference right of the permittee to renewal in the Secretary's discretion, who shall

specify numbers of stock and seasons of use.  In case of severe drought or disease epidemic, the

Secretary may reduce, refund or postpone payment of grazing fees.  43 U.S.C. § 315b.

### C. Federal Land Policy and Management Act

25.  FLPMA, 43 U.S.C. §§1701, *et seq.,* provides guidelines for public land use planning

and provides that management be on the basis of multiple use and sustained yield.  *See* 43 U.S.C.

§ 1701 (a)(7); 43 U.S.C. § 1732 (a).

26.  "Domestic livestock grazing" is a "principal or major use" of the public lands.  43

U.S.C. § 1702 (l).

27.  An "allotment management plan" prescribes the manner in which livestock

operations will be conducted in order to meet the multiple use, sustained yield, economic and

other needs and objectives, describes the range improvements to be installed to meet the

livestock and other objectives of land management and contains such other provisions relating to

livestock grazing and other objectives found by the Secretary to be consistent with the Act and

other applicable law.  43 U.S.C. § 1702 (k).

28.  43 U.S.C. § 1712 (c) provides that the Secretary shall:

(1) use and observe the principals of multiple use and sustained yield set forth in
this and other applicable law.
…
(9) to the extent consistent with the laws governing the administration of the
public lands, coordinate the land use inventory, planning , and management
activities of or for such lands with the land use planning and management
programs of … local governments within which the lands are located…. [T]he
Secretary shall keep apprised of … local … land use plans; assure that

consideration is given to those … local … plans that are germane in the development of land use plans for public lands; assist in resolving, to the extent practical, inconsistencies between Federal  and non-Federal Government plans, and shall provide for meaningful public involvement of … local government officials … in the development of land use programs, land use regulations and land use decisions for public lands, land use guidelines, land use rules and land use regulations for the public lands ….  Land use plans of the Secretary under this section shall be consistent with … local plans to the maximum extent he finds consistent with Federal law and the purposes of this Act.

29.  Under FLPMA, grazing permits to allow the grazing of domestic livestock are issued for a term of ten years, subject to such terms and conditions that the Secretary deems appropriate and consistent with law.  The Secretary may cancel, suspend or modify a grazing permit, pursuant to the terms and conditions thereof, for any violation of a grazing regulation or of any term or condition of such grazing permit.  *See* 43 U.S.C. § 1752 (a).

30.  The terms and conditions in a grazing permit that has expired shall be continued under a new permit until the date on which the Secretary completes any environmental analysis and documentation for the permit required under NEPA.  *See* 43 U.S.C. § 1752 (c)(2).

31.  The issuance of a grazing permit by the Secretary may be categorically excluded from NEPA analysis if it continues the current grazing management of the allotment, the Secretary has assessed the allotment, and the Secretary has determined that it is meeting land health standards or is not meeting land health standards due to factors other than existing livestock grazing.  *See* 43 U.S.C. § 1752 (h)(1).

32.  Implementing FLPMA, BLM's regulation at 43 C.F.R. § 1610.3-1, directs BLM to coordinate with local governments, assuring that BLM considers local government plans that are germane in the development of resource management plans for public lands.  In addition, BLM is directed to assist in resolving, to the extent practicable, inconsistencies between Federal and

non-Federal government plans and to provide meaningful public involvement of local

government officials in the development of resource management plans.

33.  Title 43 C.F.R. § 1610.3-1 further directs to develop resource management plans

collaboratively with cooperating agencies.  When developing or revising resource management

plans, BLM will invite local government to participate as cooperating agencies.  In developing

guidance to field managers, BLM's State Director shall ensure that it is as consistent as possible

with existing officially approved resource related plans, policies or programs of local

governments that may be affected, identify areas where the proposed guidance is inconsistent

with such policies, plans or programs and provide reasons why the inconsistencies exist and

cannot be remedied, and notify the local governments with whom consistency is not achieved

and indicate any appropriate methods, procedures, actions and/or programs which the State

Director may lead to resolution of such inconsistencies.

34.  Title 43 C.F.R. § 1610.3-1 further provides that local governments shall have the

prescribed period of time to review and comment on resource management plan proposals.

Should the local governments notify the field manager of specific inconsistencies between

BLM's resource management plan and their officially approved and adopted resource related

plans, "the resource management plan documentation shall show how those inconsistencies were

addressed and, if possible, resolved."

35.  Implementing FLPMA, BLM's regulation at 43 C.F.R. § 1610.3-2 sets forth

"consistency requirements."  That regulation provides, in part:

> (a) Guidance and resource management plans and amendments to management
> framework plans shall be consistent with officially approved or adopted resource
> related plans, and the policies and programs contained therein, of … local
> governments …, so long as the guidance and resource management plans are also
> consistent with the purposes, policies and programs of Federal laws and
> regulations applicable to public lands….

*Factual Allegations and Causes of Action*

36.  Harney SWCD's boundaries are coterminous with the boundaries of Harney County, Oregon, thus comprising and containing the territory and residents of Harney County.

37.  Harney SWCD lies within BLM's District in Oregon, called the Burns District.

38.  The Oregon RMPA covers and applies to the Burns District of BLM, thus including Harney SWCD and its residents.

39.  There is a large amount of Greater Sage-Grouse habitat in the Burns District (4.2 million acres), including significant amounts of PPH [preliminary priority habitat] (1.3 million acres).  *See* FEIS at 3-19.

40.  Livestock grazing is of utmost importance to Harney SWCD, because most of the economic security of the District and its inhabitants depends upon the ability of ranchers to graze livestock, including, particularly, grazing under permits on BLM allotments.

41.  The Oregon RMPA imposes regulatory burdens that cause financial and other hardships to the "public lands" ranchers who are residents of Harney County and to Harney SWCD.  *See e.g.* Exhibits B, C and D.

42.  Those "public lands" ranchers of Harney SWCD are ranchers whose likelihood depends upon their utilization, to the fullest extent possible, of their grazing privileges granted by BLM under the Taylor Grazing Act, 43 U.S.C. §§ 315, *et seq.,* which permits those ranchers to graze their cattle on BLM allotments that lie within BLM's Burns District.

43.  The Oregon RMPA imposes restrictions, conditions and obligations which impair the ability of ranchers within the Harney SWCD to conduct, in a financially successful manner, their livestock grazing operations.

44.  Livestock grazing constitutes a large share of the economic earnings of the District and of its public lands ranchers who inhabit the District.

45.  BLM states, in its FEIS at 4-327, that in Lake, Malheur and Harney Counties, livestock grazing provides an important share of all financial earnings.

46.  The ranching and livestock industry is the major industry within the Harney SWCD.

47.  Lake, Malheur and Harney Counties, and necessarily Harney SWCD, are the geographical areas where the most primary habitat management area ("PHMA") and general habitat management area ("GHMA") for the Greater Sage-Grouse are located.  *See* FEIS at 4-331.

48.  BLM acknowledges that the adverse economic impacts of the management alternatives, including the proposed alternative and now the Oregon RMPA, on livestock grazing is of particular importance to Lake, Malheur and Harney Counties, and necessarily to Harney SWCD.  *See* FEIS at 4-331.

49.  BLM acknowledges that the Counties of Lake, Malheur and Harney, and necessarily Harney SWCD, are areas where the greatest socioeconomic impacts of the Oregon RMPA occur.  *See* FEIS at 4-350.

50.  Stemming from the direct adverse impacts on livestock grazing, in the form of output, employment and earnings losses, are the additional economic losses in related industries that provide inputs and services to the livestock ranching industry where labor earnings in livestock ranching are spent.  *See* FEIS at 4-331; Exhibits B, C and D.

51.  In addition to the financial loss and increased costs to the ranchers imposed by the Oregon RMPA, which most directly affect and adversely impact the public lands ranchers within the Burns District, are the losses and impacts under the Oregon RMPA that are associated with a

diminution of a ranching lifestyle and enjoyment of open spaces, as well as a diminished market value of private ranches that are adjacent to BLM-administered land.  *See* FEIS at 4-332; Exhibits B, C and D.

52.  BLM acknowledges that local government tax revenues could be considerably affected in areas that experience reductions in economic activity.  *See* FEIS at 4-347.

53.  BLM acknowledges that based on anticipated reductions in economic activity, local communities that may be most affected by reductions in local tax revenues would be those communities where grazing forms a major basis for the local economy, specifically, in Malheur, Harney and Lake Counties.  *See* FEIS at 4-347.

54.  Plaintiff Harney SWCD is adversely affected and aggrieved by Defendants' final agency action issuing, adopting and approving the Oregon RMPA and ROD.

55.  BLM recognizes that Harney County, and necessarily Harney SWCD, has a greater percentage (18.5 percent) of residents below poverty than the State's 14.0 percent.  *See* FEIS at 4-356.

56.  Wildfire has burned over 1.5 million acres of the Greater Sage-Grouse habitat in the past decade and is one of the largest threats to the Greater Sage-Grouse habitat in Oregon.  *See* FEIS at 4-12.

57.  In 2012, 1,014,661 acres burned in Oregon.  In BLM's Burns and Vale Districts, wildfire burned over 225,000 acres, and in the Vale District, a separate wildfire burned over 500,000 acres.  *See* FEIS at 4-12.

58.  Livestock grazing is beneficial in preventing wildfires because it reduces fuel loads and is also beneficial in preventing the spread of invasive grasses.  *See* FEIS at 4-15; 4-16; 4-50.

59.  Oregon's RMPA, by limiting and curtailing livestock grazing, affects adversely not only those inhabitants of the Harney SWCD whose livelihoods depend upon grazing their livestock on BLM allotments but also the ability of the Greater Sage-Grouse to thrive and multiply.

60.  Appendix N to the FEIS depicts, by BLM allotment, whether Rangeland Health Standards, are being met on each allotment that has land within priority and general habitat for the Greater Sage-Grouse.

61.  Appendix N, which shows a date of 9/19/2012, reflects that for those many allotments within the Burns District that have been assessed, all but a comparatively few have met the required Rangeland Health Standards in all categories.

62.  As a cooperating agency having BLM-approved expertise and as an affected local government entity, Harney SWCD submitted to BLM, on or about February 19, 2014, its officially-approved "Rural Community Alternative," which provided for use of the federal land in a manner consistent with suitable livestock grazing and habitat protection for the Greater Sage-Grouse.  This Alternative was developed by a team of science advisors, the Burns BLM District personnel, Harney County ranchers, local and state government representatives and was approved by the U.S. Fish and Wildlife Service.

63.  On June 26, 2015, the Harney SWCD timely filed a protest of the Oregon Sub-regional Greater Sage-Grouse Proposed RMP and FEIS.

64.  On September 15, 2015, the Harney SWCD was notified that the BLM Deputy Director for Operations upheld the BLM's ROD.

*First Cause of Action*
*Failure to Conduct a "Consistency Review" and to Strive for "Consistency"*

65.  The preceding paragraphs are incorporated by reference herein.

16

66.  With respect to the development of the Oregon RMPA, Harney SWCD requested of BLM cooperating agency status, in order that Harney SWCD would be allowed to participate in the planning and regulatory process associated with the Oregon RMPA.  *See* FEIS at 6-5.

67.  As recognized by BLM, Harney SWCD's area of expertise is agricultural interests, livestock grazing and rangeland vegetation.  *See* FEIS at 6-5.

68.  BLM granted to Harney SWCD cooperating agency status and entered into a Memorandum of Understanding ("MOU") with Harney SWCD for that purpose.  *See* FEIS at 6-3, 6-5.

69.  As a cooperating agency having BLM-approved expertise and as an affected local government entity, Harney SWCD submitted to BLM, on or about February 19, 2014, its officially-approved "Rural Community Alternative," which provided for use of the federal land in a manner consistent with suitable livestock grazing and habitat protection for the Greater Sage-Grouse.  This Alternative was developed by a team of science advisors, the Burns BLM District personnel, Harney County ranchers, local and state government representatives and was approved by the U.S. Fish and Wildlife Service.

70.  Harney SWCD's "Rural Community Alternative" is also described as "Alternative G."

71.  Harney SWCD's "Rural Community Alternative" was official approved by the District's governing board as a plan or policy for the use of land for grazing in a manner consistent with suitable livestock grazing and habitat protection for the Greater Sage-Grouse.

72.  Harney SWCD submitted its "Rural Community Alternative" to BLM with the stated expectation that BLM would consider its Alternative and would conduct its required "consistency review" with respect to that alternative.

73. Attributes of Harney SWCD's Rural Community Alternative are:

A. It provided for closure of Research Natural Areas ("RNAs") and the use of appropriate habitat assessment framework indicators in areas encompassing 20% of priority habitat and 50% general habitat of the Greater Sage-Grouse where those areas where not meeting rangeland health standards and livestock grazing is a causal factor for not meeting those standards. When using habitat assessment framework indicators, only those indicators appropriate to the identified problem would be used. If fencing of the RNAs is determined to be necessary, such fencing would be provided by BLM or by the grazing permittees with their agreement.

B. It recognized that the greatest threats to the Greater Sage-Grouse in Oregon are wildfire and invasive plants which harm the ecological health of the range as opposed to automatically focusing on sage-grouse-specific habitat metrics. Also, vegetation management would focus on trends as important indicators over time, as opposed to point-in-time assessments.

C. It focused on aligning rangeland health assessment and planning between public grazing lands under a "candidate conservation agreement" approved by the BLM and USFWS and private lands under a "candidate conservation agreement with assurances" approved by the USFWS in order to build consistency in management, assessment and monitoring between public and private lands.

D. It provided for continuation of current rangeland monitoring procedures unless specific rangeland health issues were identified, and where grazing was found to be the cause of those issues, appropriate habitat assessment framework indicators would be considered. In that

manner, the efficiency of monitoring and assessment efforts, which are time-intensive and costly, would be maximized.

E.  It provided that appropriate habitat assessment indicators should be applied in the context of trends and site capacity, as opposed to strict adherence to habitat assessment framework methodology.

F.  It provided that alterations to grazing management should be done only when grazing is determined to be a factor in not meeting rangeland health standards, so that rangeland health drives management decisions as opposed to the habitat assessment framework.

G.  It increased the involvement of the permittee in decisions regarding drought management and does not involve the use of a drought index, because a drought index, such as the Palmer Drought Severity Index, may or may not reflect conditions on the ground, because most indexes will not account for the effects of the timing of precipitation, which could be more important than the precipitation amount.

H.  It eliminated the objective relating to brood-rearing cover in riparian areas, because moderate amounts of livestock grazing in these areas may improve sage-grouse use and access to important food plants.

I.  It provided for BLM to fund, or for voluntary cost-sharing of, labor and materials, in connection with the development of off-site water.

J.  It provided for the development, cooperatively through the candidate conservation agreement process with willing permittees, of the process to monitor and treat invasive species post-construction of new structural range improvements.

K.  It provided for cooperative actions through the candidate conservation agreement process with willing permittees to accomplish voluntary installation of fence strike markers and/or modifications.

L.  It provided for a number of specific measures to be taken to address wildfire and invasive species, the top two threats for the sage-grouse in Oregon.  That Alternative addressed those threats by means of a process to thoroughly review wildfire risk, associated consequences and operational barriers within the RMPA, including the strategic use of grazing to remove fine fuels and disrupt fuel continuity.

M.  It provided for the conduct of wildfire risk assessment using various models, including the BLM candidate conservation agreement and the Harney County candidate conservation agreement with assurances.  That Alternative called for BLM to develop fire management plans to include specific, listed tactics and cooperative actions to assess, prioritize and reduce risk of wildfire.  All directives under the Rural Community Alternative would provide for a delegation of authority to the wildfire incident commander for the most immediate suppression of wildland fire using the best and most applicable tactics, methods, and tools available to be applied in a safe manner regardless of administrative land designation, providing for protection of life, then property, followed by resources, with the sage-grouse habitat being primary among resources.

N.  It would include BLM's coordination with the counties, rangeland protection associations and other cooperating agencies when identifying annual needs for wildfire and invasive species management.

O.  It broadens the scope of BLM's preferred alternative to include management of encroaching juniper.  Western juniper can negatively impact sage-grouse habitat.  That

alternative also provided for treatment priorities.  The Rural Community Alternative would project proposed levels of habitat treatments in priority and general management areas based on wildfire and invasive/juniper encroachment assessments using State and Transition Models.

P.  It provided that the management plans for the 17 existing ACECs and 42 existing RNAs would be reviewed as part of Rangeland Health Assessments for the allotments where they are located during the permit renewal process to ensure any existing threats to sage-grouse are addressed.  Livestock AUMs in the decision area would be determined on the following basis:  Close all Research Natural Areas (RNAs) which have over 20% PPMA and/or 50% PGMA that are not meeting Rangeland Health Standards and livestock is a causal factor (as determined by a Rangeland Health Assessment conducted within the last five years).  That Alternative also provided for the use of appropriate indicators in affected RNAs, the variability of indicators, their application in the context of trends and site capability, and, if fencing is necessary, BLM would provide the fencing or it could be done in a cooperative, voluntary, cost-sharing manner by means of a cooperative agreement with permittees.

74.  Harney SWCD Rural Community Alternative is consistent with Federal law, policies, purposes and programs.

75.  Harney SWCD is aggrieved by several provisions of the Oregon RMPA, including, but not limited to Tables 2-1 and 2-2, the loss of AUMs, the sections pertaining to vegetation, fire and livestock grazing and, the Oregon RMPA's failure to include cooperative terms and mechanisms.

76.  BLM and DOI did not perform their "consistency review" obligations under Federal law and regulation with respect to Harney SWCD's proposed Rural Community Alternative.

77.  BLM and DOI did not perform their obligations under the law to consider, analyze and discuss Harney SWCD's Rural Community Alternative and did not strive for consistency of the Oregon RMPA with Harney SWCD's Rural Community Alternative.

78.  Had BLM and DOI performed their consistency review obligations and otherwise sought to achieve consistency with Harney SWCD's Rural Community Alternative, the Oregon RMPA might well have been different and might well have been more beneficial to the public lands ranchers who are permittees on BLM allotments within the District and to the Greater Sage-Grouse, in accordance with "multiple use" principles and mandates under FLMPA.

79.  BLM's and DOI's failures as described in the foregoing paragraphs are contrary to and violative of 43 U.S.C. § 1712 (c); 43 C.F.R. § 1610.3-2; 43 C.F.R. § 1610.3-1; 40 C.F.R. § 1502.16; and 40 C.F.R. § 1506.2 (d).

80.  BLM's and DOI's Oregon RMPA, its ROD and FEIS are not in accordance with law, are arbitrary or capricious and have not been made in accordance with procedures required by law, and, accordingly, should be set aside.

*Second Cause of Action*
*Failure to Discuss, Respond to and Attach Comments of Harney S&W Conservation District*
*Throughout Review Process or to the FEIS*

81.  The preceding paragraphs are incorporated by reference herein.

82.  In addition to submitting its Rural Community Alternative, Harney SWCD, as a cooperating agency having BLM-approved expertise and as an impacted local government entity, submitted to BLM, on or about February 19, 2014 its comments, numbering 18 pages in length, with respect to the draft Oregon RMPA.  Harney SWCD also extensively participated with the BLM throughout the process, providing substantive comments on July 26, 2013 and August 1, 2014.  Harney SWDC provided verbal explanations to the BLM regarding the Rural Community

Alternative on March 26, 2014 and April 10, 2014.  Harney SWCD's comments and

explanations were summarily dismissed because the National BLM determined it did not have

time to consider the substantive comments.

83.  BLM and DOI did not discuss or respond to those comments of Harney SWCD or

attach those comments to BLM's proposal throughout the review process or attach them to the

final environmental impact statement, contrary to and violative of 42 U.S.C. § 4332 (C); 40

C.F.R. § 1503.4; and 40 C.F.R. 1501.1.

84.  Had BLM and DOI performed their obligations and discussed, responded to,

considered and attached those comments throughout the review process, the Oregon RMPA

might well have been different and might well have been more beneficial to the public lands

ranchers who are permittees on BLM allotments within the District and to the Greater Sage-

Grouse, in accordance with "multiple use" principles and mandates under FLPMA.

85.  BLM's and DOI's Oregon RMPA, its ROD and FEIS are not in accordance with law,

are arbitrary or capricious and have not been made in accordance with procedures required by

law, and, accordingly, should be set aside.

### Third Cause of Action
### Failure to Cooperate and Coordinate

86.  The preceding paragraphs are incorporated by reference herein.

87.  Although Harney SWCD was designated a "cooperating agency" by BLM, based on

its recognized expertise in agricultural and relevant resource issues, and, although BLM entered

into a MOU with Harney SWCD for purposes of developing a land use plan regarding the

Greater Sage-Grouse, in accordance with "multiple use" mandates, BLM and DOI did not

cooperate and coordinate with Harney SWCD, in refusing to consider Harney SWCD's Rural

Community Alternative and in refusing to consider, discuss, respond to or even attach the

District's comments throughout the review process, contrary to and violative of 42 U.S.C. §

4331; 40 C.F.R. § 1506.2;  43 U.S.C. § 1712 (c); 43 C.F.R. § 1610.3-1; 43 C.F.R. § 46.155; and

43 C.F.R. § 46.415.

88.  Had BLM and DOI "cooperated" with Harney SWCD in the manner required by law,

the Oregon RMPA might well have been different and might well have been more beneficial to

the public lands ranchers who are permittees on BLM allotments within the District and to the

Greater Sage-Grouse, in accordance with "multiple use" principles and mandates under FLPMA.

89.  BLM's and DOI's Oregon RMPA, its ROD and FEIS are not in accordance with law,

are arbitrary or capricious and have not been made in accordance with procedures required by

law, and, accordingly, should be set aside.

*Fourth Cause of Action*
*Failure to Consider a Reasonable Range of Alternatives*

90.  The preceding paragraphs are incorporated by reference herein.

91.  In refusing to consider Harney SWCD's Rural Community Alternative, BLM and

DOI did not consider a reasonable range of alternatives when engaging in its environmental

impact analysis with respect to the Oregon RMPA.

92.  One commenter on the draft environmental impact analysis ("DEIS"), comment no.

OR-GRSG-0093-4, observed that the Harney SWCD's Rural Community Alternative, termed

"Alternative G," raised concerns of the rural communities, noting that the DEIS "can and should

be improved by providing consideration of Alternative G," and requested of BLM that it add

Alternative G the DEIS.

93.  In the FEIS, at Appendix V, section 4.3, BLM addressed the comment that:  "The

BLM needs to consider the alternatives presented by cooperating agencies including the county

alternatives, the Conservation Groups' alternative (specifically the Harney County Soil and Water Conservation District Rural Community Alternative)…".

94. BLM responded to that comment, stating: "Since the purpose of BLM's action is narrowly focused on conserving GRSG habitats and population, the range of alternatives was constructed to meet this narrowly focused purpose and need."

95. BLM and DOI erred in rejecting consideration of Harney SWCD's Rural Community Alternative based on its "narrow focus," because BLM and DOI remain obliged under the law to construct their land use plans in accordance with "multiple use" mandates.

96. BLM and DOI improperly restricted the range of alternatives and, in so doing, violated the law that requires that a "reasonable range of alternatives" be considered and that requires that it identify and assess reasonable alternatives that will avoid or minimize adverse impacts upon the quality of the human environment under NEPA.

97. By not applying a reasonable range of alternatives in accordance with the multiple use mandates of FLPMA, BLM and DOI acted in a manner that is not in accordance with and violative of 42 U.S.C. § 4332 (E); 40 C.F.R. § 1500.2 (e); 40 C.F.R. § 1502.14; 43 U.S.C. § 1701 (a)(7); 43 U.S.C. § 1732 (a); and 43 U.S.C. § 1702 (l).

98. BLM's and DOI's Oregon RMPA, its ROD and FEIS are not in accordance with law, are arbitrary or capricious and have not been made in accordance with procedures required by law, and, accordingly, should be set aside.

*Prayer for Relief*

99. Harney SWCD seeks an order from this Court holding unlawful, enjoining implementation of, and vacating the Oregon RMPA and the ROD and FEIS. Harney SWCD also requests attorneys' fees, costs and such further relief as the court deems just and proper.

RESPECTFULLY SUBMITTED this 7th day of December, 2016.

/s/Karen Budd-Falen
Karen Budd-Falen
Andrea R. Buzzard
BUDD-FALEN LAW OFFICES, LLC
300 East 18th Street
Post Office Box 346
Cheyenne, WY  82003-0346
(307) 632-5105 Telephone
(307) 637-389 Telefax
karen@buddfalen.com
andrea@buddfalen.com